UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Devon Miguel Rivera
_____

Write the full name of each plaintiff.

-against-

Regal Entertainment Group
_____

_____

Write the full name of each defendant. The names listed above must be identical to those contained in Section I.

20 CV 523

_____CV_____
(Include case number if one has been assigned)

Do you want a jury trial?
☑ Yes    ☐ No

# EMPLOYMENT DISCRIMINATION COMPLAINT

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 3/24/17

## I. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Devon | M | Rivera |
|---|---|---|
| First Name | Middle Initial | Last Name |

| 4431 De Reimer Avenue |
|---|
| Street Address |

| Bronx | NY | 10466 |
|---|---|---|
| County, City | State | Zip Code |

| | |
|---|---|
| Telephone Number | Email Address (if available) |

### B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:
| Regal Entertainment Group |
|---|
| Name |
| 850 Broadway |
| Address where defendant may be served |

| Manhattan | New York | 10466 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:
| |
|---|
| Name |
| |
| Address where defendant may be served |

| | | |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

_____
Name

_____
Address where defendant may be served

_____
County, City          State          Zip Code

## II. PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

**Regal Entertainment Group**
Name

Address
**Manhattan**                    **New York**              **10003**
County, City                     State                     Zip Code

## III. CAUSE OF ACTION

### A. Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

- ☒ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

    The defendant discriminated against me because of my (check only those that apply and explain):

    - ☒ race: _____
    - ☒ color: _____
    - ☐ religion: _____
    - ☐ sex: _____
    - ☐ national origin: _____

☒ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

    My race is: _____

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

    I was born in the year: _____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

    My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

    My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

## B. Other Claims

In addition to my federal claims listed above, I assert claims under:

☒ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☒ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_____

Page 4

## IV. STATEMENT OF CLAIM

### A. Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐ did not hire me
- ☒ terminated my employment
- ☐ did not promote me
- ☐ did not accommodate my disability
- ☒ provided me with terms and conditions of employment different from those of similar employees
- ☒ retaliated against me
- ☒ harassed me or created a hostile work environment
- ☐ other (specify): _____

### B. Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

See Attached

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V. ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☒ Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge? _____

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☒ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?    10/21/19

When did you receive the Notice?   10/26/19

☐ No

## VI. RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☒ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☒ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)
Compensatory and Emotional damages

_____

_____

_____

_____

Page 6

## VII.  PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 1/17/2020 | | *Devon Rivera* |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Devon | M | Rivera |
| First Name | Middle Initial | Last Name |
| 4431 De Reimer Ave. | | |
| Street Address | | |
| Bronx | New York | 10466 |
| County, City | State | Zip Code |
| 917-680-2490 | | |
| Telephone Number | | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

EEOC Form 161-B (11/16)           **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Devon M. Rivera<br>4431 De Reimer Avenue<br>Bronx, NY 10466 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2019-06007 | **Ashraf Ahmed,** Investigator | (929) 506-5298 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[ ] More than 180 days have passed since the filing of this charge.

[X] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice**. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____     10/21/19
Kevin J. Berry,                      (Date Mailed)
District Director

Enclosures(s)

cc:  **Attn
Director of Human Resources
REGAL UNION SQUARE
850 Broadway
New York, NY 10003**

## Statement of Facts[1]

1. I live at 4431 De Reimer Avenue, Bronx, NY 10466.

2. I am a black African-American.

## Employment Background

3. In approximately October of 2008, I began working at Regal Entertainment Group ("Regal") at the movie theater located at Union Square, 850 Broadway Manhattan, New York. Regal Union Square has approximately 100 employees.

4. My final position was "maintenance technician." As maintenance technician, I was solely responsible for general maintenance at the theater. My responsibilities included maintaining overall cleanliness and appearance, painting where and when needed, addressing plumbing needs, and taking care of all general handy work.

5. I worked on a full-time basis, which was approximately 39 hours per week.

6. I was originally hired as a concessionist making $7.50 per hour.

7. After 1 or 2 years, I was promoted to maintenance technician starting at $12.50 per hour. I received annual pay raises of approximately $1.00 per hour. By the time I was terminated, I made approximately $16.00 per hour.

8. In my capacity as maintenance technician, I worked directly with the theater General Manager who oversaw my work. I reported directly to the General Manager.

9. There were approximately 5 or 6 "managers" at the theater, who oversaw the daily operations of the theater, such as concession sales, ticket sales, and movie operations. They also reported to the General Manager. The managers and their responsibilities were separate from maintenance. As a result, I did not report directly to any of these managers.

10. From around 2008 through January 2018, Kathy Sills was the general manager. Kathy is a Caucasian American. Kathy and I had a very good working relationship. We never had any issues, disputes or altercations. Kathy never complained about my upkeep of the building or any other maintenance need. Kathy gave me consistently favorable employee evaluations. I received approximately 5 raises under Kathy. I never had to raise any issues about Kathy or her role as general manager with Human Resources.

11. From around early Jan 2018 to May 2018, Anthony Sautter was the general manager. Sautter is Caucasian American. I had a very good working relationship with Sautter. We never had any issues, disputes or altercations. Sautter never complained about my upkeep of the building or any other maintenance need. I never had to raise any issues about

---

[1] Prepared with assistance of the NYLAG Pro se Legal Clinic.

Sautter or his role as general manager with Human Resources. Sautter gave me the authority and discretion to take care of building maintenance.

12. From approximately 2008 until May 2018, the Maintenance Manager, Sharon Shah, acted as liaison between me and the General Manager. I often reported to her as she and I were usually in the building in the early morning, whereas the General Managers began work in the early afternoon.

13. During Sautter's time as General Manager at Union Square, he hired an extra Maintenance person named Louis Barbossa to assist with the demands of maintenance at the theater. Barbossa is a light-skinned Hispanic.

14. Barbossa did not have maintenance experience at the theater or know the building and its needs. He also did not have strong English skills. I became a liaison between Barbossa and the General Manager. I communicated with Barbossa and guided, directed and essentially oversaw him in the maintenance of the theater. I had a productive, good working relationship with him. We never had any issues, disputes or altercations.

15. I later learned that Barbossa had been paid more than me even though I had more experience and seniority.

16. To assist with maintenance, I was assigned a Theater Usher to assist me with carrying ladders, and assisting in larger projects.

**Supervisor Change Giving Rise To This Action**

17. In mid to late 2018, Robert (Bobby) Fiandra became the general manger. Fiandra is an Caucasian American. My issues at work began when Fiandra became the General Manager.

18. Within a couple of weeks, in October 2018, Fiandra began to change maintenance operations.

19. In one substantial change, Fiandra made the "safe manager" the maintenance manager. Among the safe manager's responsibilities was overseeing maintenance and my operations as maintenance technician.

20. The 5 or 6 operations managers rotated through the position of safe manager for given shifts. Therefore, every day, a different manager assumed the role as safe manager.

21. Fiandra oversaw the safe manager.

22. Prior to that time, I did not work directly with or report to the managers.

23. The job description for my position as maintenance technician provided that I report to the General Manager. The new change was inconsistent with my original job description.

24. In October 2018, Fiandra made additional changes. He created an hourly check list of daily actions for all employees.

25. For my position as maintenance technician, Fiandra created new procedures that required me to check into the office of the Safe Manager once per hour.

26. Early on, I found that the new procedure interfered with my ability to fulfill my job duties and responsibilities as maintenance technician.

27. Changing the procedure to make the safe manager the manager of maintenance created problems because the safe manager changed daily. Issues and repairs that needed to be done often were not communicated to the safe manager for the next day.

28. Therefore, issues and repairs were often left incomplete or unanswered and I was unable to complete important responsibilities that were specifically stated in my job description.

29. For example, I was responsible for monthly emergency light checks and maintenance that were critical for safe operation of the theater and a FDNY safety requirement, which, if not addressed could shut the building down.

30. The safe managers often did not know what maintenance issues there were and what tasks were important and which took priority.

31. Often, even after I consulted with the safe manager, the safe manager did not know how to proceed and would want to involve Fiandra.

32. When faced with deciding how to proceed, the safe manager's frequent response was "I don't know. Let's talk to Bobby."

33. The extra step trying to involve the safe manager resulted in wasted time and unnecessary confusion and interfered with critical aspects of my job.

34. Fiandra also created a maintenance checklist that caused frequent and daily issues.

35. Because the maintenance technician was required to address issues that would spontaneously occur and that would require immediate action and complete deviation from the checklist.

36. Finally, the requirement that I check into the office of the Safe Manager once an hour interfered with my job.

37. Checking in with the safe manager every hour required me to stop my task and walk to the main office to "check in." This slowed down progress as I had to always stop work and take 10 minutes to walk to and from the office and back to my work.

38. Even though the work changes were interfering with my ability to get work done, I always did what was asked of me.

39. Within a couple of weeks, I felt that the new changes were not working. I raised the problems with Fiandra. I advised Fiandra that I did not think the new changes were working and why they were interfering with my ability to complete the required maintenance work complete. I raised these issues in one or two conversations in passing and at least twice in meetings in his office.

40. Fiandra responded that his changes were a work in progress and that he was trying to find a system that would work. At this point, the discussions were friendly.

41. Soon after this time, I also met with ~~Beggina~~ Bettina J. Jimenez from Human Resources Department at the theater to raise my concerns about the new procedures and seek clarification about my job description.

42. I also raised my questions with some of the managers who were Safe Managers, now overseeing maintenance. I raised questions with them to insure the quality of maintenance.

43. Because of ongoing issues, I thereafter met with Bobby and Bettina Himenez, the Human Resource manager, on 3 occasions in October to discuss the issues with the new checklist and procedures.

**Discriminatory Conduct/Hostile Work Environment**

44. Around the end of October 2018, my issues with Fiandra came to a head. Fiandra told me to paint a door. In response, I asked him "which size roller should I use." My question was non-threatening. Nothing about my question was disrespectful or insubordinate. In response, Fiandra became visibly agitated, his face turned red, and he shouted at me.

45. Fiandra ordered security to get my "monkey ass out of here." I was then escorted out of the building and barred from using the bathroom.

46. First Assistant Manager Peter Baez and another unknown manager were present at the time. Bettina Jimenez, present on behalf of HR, did not say or do anything in response to my ejection.

47. After I was escorted out the building, I immediately called Human Resources at the corporate office in Tennessee. No one answered.

48. I left a message explaining what had happened and that I had been thrown out of the building. No one returned my call.

49. The next day, I returned to work. I did not receive any counseling or any explanation for what had occurred.

50. I asked for a meeting and met with Fiandra. I informed Fiandra that his conduct violated the employee handbook and his authority as a General Manager. I told him that his conduct was not appropriate and that I felt dehumanized and embarrassed when security kicked me out. I told him "I felt like I was a prisoner." I told him that I felt like he was discriminating against me and treating me differently because of my race. At that time, I asked to have a meeting with the District Manager, Anthony Sautter.

51. The next day, on or around October 31, I advised Anthony Sautter, the District Manager, that Fiandra had used excessive and unnecessary force to remove me from the building. I informed him how Fiandra made me feel victimized and dehumanized me and discriminated against me.

52. He asked me about my accusation of race discrimination. I repeated that I believed that Fiandra was giving me a hard time at work because of my race.

53. I also mentioned that Sautter, himself, had discriminated against me when he was General Manager because I had learned that Barbossa, the light skinned Hispanic, made more money per hour than me, even though I was overseeing and directing Barbosa and had more experience and seniority than Barbosa.

54. At that meeting, I also told Sautter about the changes I had suggested to Fiandra's checklists and procedures. Sautter told me that he agreed with many of my suggestions and recommendations. The meeting lasted three hours. I was about to leave for a brief vacation, but Sautter promised to implement the suggested changes when I got back from vacation. Nothing changed after I returned.

55. At that meeting, Anthony Sautter did not take any action or discipline Fiandra or investigate how Fiandra's conduct violated the employee handbook. Sautter did not respond to my comment that Fiandra was making the work environment so difficult for me because of my race and as a result of discrimination.

56. Around the time of these incidents, in October 2018, the Human Resources Department held a training session to address issues that had arisen due to discrimination, harassment and bullying in the workplace between employees and management.

57. The training stressed a zero tolerance policy and specifically addressed how management and the General Manager are meant to handle these occurrences.

58. The training established a strict protocol as how to handle any issues regarding discrimination, harassment, and bullying.

59. Even though I brought up my discrimination claims on two occasions, no one from Human Resources, Fiandra, or Sutter followed the protocol to investigate my claim of discrimination.

60. Fiandra and Regal discriminated against me in the terms and conditions of my employment by failing to follow employment handbook protocol for responding to employment issues in the workplace and by demanding that security kick me out of the building for no reason, in spite of my long employment history at Regal.

61. Fiandra's derogatory comment about throwing "my monkey ass out of here" was clear and overt evidence that Fiandra's conduct was motivated by racial animus.

62. Fiandra's conduct, treating me like a criminal to be ejected by security, created a hostile work environment for me.

63. Neither Fiandra nor Regal ever demanded that security remove any white or non-black employee under such circumstances.

64. Sautter's subsequent failure to discipline or investigate Fiandra's conduct and his failure to follow the zero tolerance policy of discrimination and harassment is further evidence of racial animus against me and hostile work environment.

**Unlawful Termination**

65. After the incident and my October 31st meeting with Sautter, I took the rest of the week off for a previously scheduled vacation.

66. When I got back to work, in November 2018, Fiandra no longer demanded that I check in with Safe Managers. I resumed my work as maintenance technician as I had prior to Fiandra's arrival and consistent with the maintenance job description.

67. About a month after the incident, I was unlawfully terminated under pretense based on discrimination and in retaliation for raising the discrimination claim with Sautter.

68. On December 1, 2018 around 10am, I was conducting my job.

69. As part of routine maintenance and cleaning, I found a bag of an unknown substance in the elevator. I picked it up and put it in my pocket to turn over to management once I finished my assignment.

70. At that moment, I was working on moving equipment from storage, including moving dozens of freshly painted trash can lids. The day was especially busy because the entire staff was getting the theater to prepare for a visit from Corporate VIP.

71. In the course of all the hustling, I forget about picking up the bag in the elevator. I only realized later in my shift that the bag was missing from my pocket. I ended my shift around 4 or 5pm.

72. One day later, mid shift around 12pm, I was called into Fiandra's office.

73. Jimenez of HR was present. Fiandra informed me that they had retrieved the bag just outside of the elevator, had reviewed video camera footage, and saw the bag falling off my person.

74. I did not see the video and there is no protocol on what to do if an employee, especially in the unique position as maintenance technician, finds what appears to be illegal drugs.

75. Fiandra asked me to write a statement and told me I was suspended pending further investigation.

76. A week or so later, Fiandra informed me by phone that I was being terminated. I was told that I had an opportunity to write an appeal. I drafted an appeal letter and submitted it.

77. In terminating me, Fiandra, HR, and the rest of Regal Union Square's supervisors failed and refused to consider my statement both in the suspension meeting and set forth in my appeal where I explained that the alleged substance did not belong to me and the circumstances surrounding how I actually came into possession of the bag.

78. Fiandra did not start an official investigation immediately upon discovering the bag or reviewing the camera footage.

79. Regal did not give me any warnings and failed to follow the Employment Manual's 4 step termination process. No one ever tested or confirmed that the substance was an illegal substance.

80. The circumstances of my termination support the conclusion that I was terminated or discriminatory or retaliatory reasons.

81. Prior to any kind of termination, other non-black employees have been afforded a fair investigation and opportunity to follow the Employee Manual's termination process; they have received warnings and were afforded protections provided under the Employment Manual's termination and appeal process.

82. Fiandra and Regal Union discriminated against me by failing to consider my statement or follow the employee manual in terminating me, an employee who had always been in a good standing at Regal.

83. Fiandra and Regal discriminated against me by unfairly singling me out for discipline in ways that they did not discipline or terminate non-black employees under circumstances that support an inference that their unfair treatment and disparate treatment was on the basis of race.

84. Fiandra's and Regal's efforts to speed up my termination without a proper investigation was a further pretext to terminate me on the basis of my race.

85. Given the short time between my complaint about discrimination and the event that occurred approximately one month later, Regal Union Square's efforts to speed up my termination without a proper investigation supports a conclusion that the termination was done in retaliation for my protected activity of raising an objection to Fiandra's and Regal Union Square's discriminatory conduct a few weeks earlier at the HR meeting and the meeting with Sautter.

86. On _____, I filed a complaint with the EEOC.

87. On October 21, 2019, I received a Right to Sue letter from the EEOC.